**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL RUBIN, Derivatively on Behalf of MISONIX, INC.,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL A. MCMANUS, JR., STAVROS G. VIZIRGIANAKIS, RICHARD A. ZAREMBA, JOHN W. GILDEA, CHARLES MINER, III, PATRICK A. MCBRAYER, THOMAS M. PATTON, and T. GUY MINETTI,<br><br>-and-<br><br>MISONIX, INC., a New York corporation,<br><br>Nominal Defendant. | Index No.<br><br>VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Michael Rubin ("Plaintiff" or "Rubin"), by and through his undersigned attorneys, hereby submits this Verified Stockholder Derivative Complaint for the benefit of nominal defendant Misonix, Inc. ("Misonix" or the "Company") against certain of its current and former directors and officers. Plaintiff bases his allegations on personal knowledge as to his own acts and on information and belief as to all other allegations, based upon due investigation by counsel, including, among other things: (a) review and analysis of public filings made by Misonix with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications caused or allowed to be disseminated by the Company, certain of the Defendants, and other persons; (c) review and analysis of news articles, shareholder communications, and postings on Misonix's website concerning the Company's public statements and the conduct of the Individual Defendants; (d) review and analysis of other publicly available information concerning Misonix, the Individual Defendants, and other persons; and (e) review and analysis of the complaint and other filings in the securities fraud class action lawsuit, *Scalfani v. Misonix, Inc., et al.*, Case No. 16-cv-5218 (E.D.N.Y), filed against Misonix and certain of its officers and directors.

## PRELIMINARY STATEMENT

1. Misonix was caused by its directors and officers to represent in documents publicly filed with the SEC that it had an effective system of internal controls and was in compliance with the laws and regulations under which it operated. However, the representations were far from the truth. In fact, the Company's internal control system was ineffective, its management was part and parcel of the material weaknesses in the internal control system, and the Company's distributor in China – its largest customer for the past three years – had engaged in business practices in violation of the Foreign Corrupt Practices Act ("FCPA"). The truth

regarding Misonix's operations was gradually trickled out by the Defendants over time, leading to lawsuits and government investigations that have already substantially damaged, and pose the prospect of further material damage to, the Company and its shareholders.

2. On August 28, 2016, just a few months after representing to the public and the Company's shareholders that Misonix had an effective system of internal controls and was in compliance with the laws and regulations under which it operated, the Company announced the "retirement" of then-President and Chief Executive Officer ("CEO") Michael J. McManus ("McManus"). No explanation for McManus' retirement was provided, and the Company disclosed that it would continue to pay his salary and other benefits through at least June 30, 2017.

3. One month after announcing Defendant McManus' "retirement," Misonix revealed that it had contacted the SEC and the U.S. Department of Justice ("DOJ") to inform both agencies that the Company had knowledge of certain business practices of the company with which Misonix contracted to distribute its products in China that were in violation of the FCPA and that the Audit Committee of the Misonix Board of Directors (the "Board") retained outside counsel to conduct an investigation of the FCPA violations and other matters. As such, the Company disclosed that its Annual Report on Form 10-K for the Fiscal Year ended June 31, 2016 (the "2016 10-K") would not be timely filed with the SEC.

4. On February 9, 2017, Misonix belatedly filed with the SEC its 2016 10-K. In the 2016 10-K, the Company admitted that, contrary to its prior statements, it "did not have an effective control environment, risk assessment process, information and communication processes and monitoring activities," and that it had "ineffective ethical governance controls, and ineffectively implemented policies and procedures." Misonix further disclosed in the 2016 10-K

that ***ten months earlier***, the Board had been informed by management of violations of Company policies and procedures and possible violations of laws and regulations" by Defendant McManus and "other Company personnel."

5. The concealment of the CEO's misconduct for ten months was in utter disregard of the Defendants' fiduciary duties to the Company and its shareholders. Indeed, the Board's determination to allow Defendant McManus to "retire" with substantial golden parachutes and continued payment of benefits, rather than being fired for "cause," was plainly made in bad faith to the detriment of the Company and its shareholders.

6. Moreover, the disclosures in the 2016 10-K gave the lie to representations made in Company's Proxy Statement filed with the SEC on December 30, 2015 (the "2016 Proxy") soliciting stockholders to approve executive compensation packages for Company personnel, including, but not limited to, Defendant McManus. In addition to omitting material information concerning the Company's inadequate internal controls, the 2016 Proxy also represented that the salaries paid to Misonix executives were based on individual performance and the Company's performance, which was demonstrably false. While the 2016 Proxy represented that the Company would terminate McManus for cause if appropriate, that representation was also demonstrably false in that the Company allowed McManus to "retire" after his malfeasance was discovered and brought to the attention of the Board. Rather than terminating McManus for cause, the Board determined to continue to pay his salary and other benefits.

7. The Company further disclosed in the 2016 10-K that Cicel (Beijing) Science & Technology Co. Ltd. ("Cicel"), which had been the Company's Chinese distributor and "largest single customer for the last three fiscal years," had been terminated "due to allegations of potential violations of laws."

8. The pending investigation disclosed in the 2016 10-K was subsequently cited by Misonix for its delay in filing with the SEC the Quarterly Reports on Form 10-Q for the periods ended September 30, 2016 and December 31, 2016. These Quarterly Reports, when finally filed, revealed that the Defendants continued in their failure to implement and maintain an effective system of internal controls, and that rather than curing these weaknesses they had been allowed by the Individual Defendants (as defined below) to persist and fester. Additionally, Misonix revealed that it had incurred about $2.1 million in investigative costs related to the Audit Committee investigation into violations of the FCPA and other wrongdoing.

9. Through this action, Plaintiff seeks to recover from the Individual Defendants, for the benefit of Misonix, the damages they inflicted upon the Company through their breaches of fiduciary duty. Plaintiff has made no demand upon the Company's Board since to do so would be a futile, wasteful and useless act due to the lack of independence and disinterest of the Board members and their substantial likelihood of liability for the misconduct described herein.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over the violations of Section 14(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder by the SEC, pled herein pursuant to 28 U.S.C. §1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"). Supplemental jurisdiction over the remaining claims exists pursuant to 28 U.S.C. §1367.

11. This Court has jurisdiction over each Defendant. Misonix conducts business, and maintains its corporate headquarters, in this District, which renders the Court's exercise of jurisdiction permissible under traditional notions of fair play and substantial justice. The Individual Defendants, as corporate officers or directors of Misonix, have sufficient minimum

contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

12. Pursuant to 28 U.S.C. § 1391(a), venue is proper in this District where Misonix maintains its corporate headquarters, where a substantial portion of the transactions and wrongs complained of herein occurred, and where the Individual Defendants, as corporate officers and directors of Misonix, have received substantial compensation and have engaged in numerous activities that had an effect in this District.

## THE PARTIES

13. Plaintiff Michael Rubin was a stockholder of Misonix at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and continues to hold Misonix stock.

14. Nominal Defendant Misonix is a surgical device company that designs, manufactures, and markets therapeutic ultrasonic products for neurosurgical, spinal, advanced wound care, and general surgery procedures, operating in over 45 countries. Misonix is incorporated in the State of New York, and maintains its headquarters at 1938 New Highway, Farmingdale, NY 11735.

15. Defendant McManus was Misonix's President and CEO from November 1999 to September 2016, Chairman of the Misonix Board from November 2010 to September 2016, and a member of the Board from 1998 to September 2016.

16. Defendant Stavros G. Vizirgianakis ("Vizirgianakis") is the President and CEO of Misonix since December 2016, served as interim President and CEO from September 2016 until December 2016, and has served as a member of the Board since 2013.

17. Defendant Richard A. Zaremba ("Zaremba") has served as Misonix's Secretary and Treasurer since March 1999 and as Senior Vice President, Finance since September 2016. Zaremba also served as Misonix's Chief Financial Officer ("CFO") and Senior Vice President from February 1999 to September 2016 and as Vice President from February 1999 to September 2004.

18. Defendant John W. Gildea ("Gildea") has served as a member of the Board since 2004, is a member of the Audit Committee of the Board, served as a member of the Compensation Committee of the Board from 2004 until December 2015, and is the Chairman of the Nominating and Governance Committee of the Board.

19. Defendant Charles Miner, III ("Miner") has served as a member of the Board since 2005, and is a member of the Compensation Committee of the Board.

20. Defendant Patrick A. McBrayer ("McBrayer") has served as a member of the Board since 2014, is the Chairman of the Compensation Committee, and is a member of the Audit Committee and Nominating and Governance Committee of the Board.

21. Defendant Thomas M. Patton ("Patton") has served as a member of the Board since 2015, is the Chairman of the Audit Committee, and is a member of the Compensation Committee and Nominating and Governance Committee of the Board.

22. Defendant T. Guy Minetti ("Minetti") served as a member of the Board from March 2003 to December 2016. Minetti was the Chairman of the Audit Committee of the Board from 2010, and a member of the Audit Committee from 2003, to December 2015. Minetti was also a member of the Compensation Committee of the Board from 2003 to December 2016.

23. Defendants Vizirgianakis, Gildea, Miner, McBrayer, and Patton are collectively referred to herein as the "Director Defendants." Defendants McManus, Vizirgianakis, Zaremba,

Gildea, Miner, McBrayer, Patton, and Minetti are collectively referred to herein as the "Individual Defendants."

## THE INDIVIDUAL DEFENDANTS' DUTIES

24. By reason of their positions as officers, directors, and/or fiduciaries of Misonix and because of their ability to control the business and corporate affairs of Misonix, the Individual Defendants owe and owed Misonix and its shareholders fiduciary obligations of good faith, loyalty, and due care, and were and are required to use their utmost ability to control and manage Misonix in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Misonix and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes and owed to Misonix and its shareholders the fiduciary duty to exercise good faith, loyalty and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

25. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Misonix, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Misonix, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

26. To discharge their duties, the officers and directors of Misonix were required to exercise reasonable and prudent supervision over the management, policies, practices and internal controls of the Company. By virtue of such duties, the officers and directors of Misonix were required to, among other things.

- Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

- Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

- When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct and prevent its recurrence.

27. Pursuant to the Misonix Code of Business Conduct & Ethics (the "Ethics Code"), all employees, directors, and agents of Misonix must, among other things:

- Comply with both the letter and spirit of all applicable national, regional and local legal requirements and regulations;

- Learn and follow the policies and procedures that apply to their roles;

- Promptly report any concerns including potential violations of the Ethics Code or Misonix's policies and procedures to an appropriate person; and

- Never engage in deception, fraud, misrepresentation, or work with others to restrict competition.

**ADDITIONAL DUTIES OF THE AUDIT COMMITTEE**

28. Pursuant to the Charter of the Audit Committee, all members of the Audit Committee are responsible for overseeing the financial reporting and disclosure process, and have the following, among other, responsibilities:

- To (i) select and retain an independent registered public accounting firm to act as the Company's independent auditors for the purpose of auditing the Company's annual financial statements, books, records, accounts and internal controls over financial reporting, (ii) set the compensation of the Company's independent auditors, (iii) oversee the work done by the Company's independent auditors and (iv) terminate the Company's independent auditors, if necessary;

- At least annually, to obtain and review a report by the Company's independent auditors that describes (i) the accounting firm's internal quality control procedures, (ii) any issues raised by the most recent internal quality control review, peer review or Public Company Accounting Oversight Board review or

inspection of the firm or by any other inquiry or investigation by governmental or professional authorities in the past five years regarding one or more audits carried out by the firm and any steps taken to deal with any such issues, and (iii) all relationships between the firm and the Company or any of its subsidiaries; and to discuss with the independent auditors this report and any relationships or services that may impact the objectivity and independence of the auditors;

- To review with management and the Company's independent auditors: any major issues regarding accounting principles and financial statement presentation, including any significant changes in the Company's selection or application of accounting principles; any significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including the effects of alternative GAAP methods; and the effect of regulatory and accounting initiatives and off-balance sheet structures on the Company's financial statements;

- To review with management and the Company's independent auditors the adequacy and effectiveness of the Company's financial reporting processes, internal control over financial reporting and disclosure controls and procedures, including any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's processes, controls and procedures and any special audit steps adopted in light of any material control deficiencies, and any fraud involving management or other employees with a significant role in such processes, controls and procedures, and review and discuss with management and the Company's independent auditors disclosure relating to the Company's financial reporting processes, internal control over financial reporting and disclosure controls and procedures, and if applicable, the independent auditors' report on the effectiveness of the Company's internal control over financial reporting to be included in or attached as exhibits to the Company's annual report on Form 10-K;

- To review and discuss with the Company's independent auditors and management the Company's quarterly financial statements to be included in the Company's quarterly report on Form 10-Q before the Form 10-Q is filed;

- To establish and oversee procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters;

- To review and discuss with management the risks faced by the Company and the policies, guidelines and process by which management assesses and manages the Company's risks, including the Company's major financial and regulatory risk exposures and the steps management has taken to monitor and control such exposures;

- To review the Company's compliance with applicable laws and regulations and to review and oversee the Company's policies, procedures and programs designed to promote and monitor legal, ethical and regulatory compliance; and

- To review, with the General Counsel and/or outside legal counsel, legal and regulatory matters, including legal cases against or regulatory investigations of the Company, that could have a significant impact on the Company's financial statements.

## ADDITIONAL DUTIES OF THE COMPENSATION COMMITTEE

29. Pursuant to the Charter of the Compensation Committee, all members of the Compensation Committee are responsible for the review and determination of executive compensation, and have the following, among other, responsibilities:

- To review and approve annually the corporate goals and objectives applicable to the compensation of the chief executive officer ("CEO"), evaluate at least annually the CEO's performance in light of those goals and objectives, and determine and approve the CEO's compensation level based on this evaluation. In evaluating and determining CEO compensation, the Committee shall consider the results of the most recent stockholder advisory vote on executive compensation ("Say on Pay Vote") required by Section 14A of the Exchange Act;

- To review, and make recommendations to the Board regarding, or approve, incentive compensation plans and equity-based plans, and where appropriate or required, recommend for approval by the stockholders of the Company, which includes the ability to adopt, amend and terminate such plans;

- To review and approve, with respect to the CEO, and to review, make recommendations to the Board regarding, or approve, with respect to the other executive officers, any employment agreements and any severance arrangements or plans, including any benefits to be provided in connection with a change in control, which includes the ability to adopt, amend and terminate such agreements, arrangements or plans; and

- To review the Company's incentive compensation arrangements to determine whether they encourage excessive risk-taking, to review and discuss at least annually the relationship between risk management policies and practices and compensation, and to evaluate compensation policies and practices that could mitigate any such risk.

## SUBSTANTIVE ALLEGATIONS

30. As a global business, Misonix is subject to extensive regulations. As stated in its Annual Report on Form 10-K for the Fiscal Year ended June 30, 2015 filed with the SEC on August 20, 2015 ("2015 10-K"), the Company's "business activities are subject to rigorous regulation, including by the FDA, DOJ, and numerous other federal, state and foreign governmental authorities." In the 2015 10-K, Misonix acknowledges that its "international operations must comply with U.S. law, including the U.S. Foreign Corrupt Practices Act" in addition to "similar foreign anti-corruption laws" and further acknowledges that recently "there has been a substantial increase in the global enforcement of anti-corruption laws." The 2015 10-K contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants McManus and Zaremba attesting to the existence of effective internal controls and corporate governance procedures, representing as follows:

> I, [McManus/Zaremba], certify that:
>
> 1. I have reviewed this annual report on Form 10-K of MISONIX, INC.;
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
> 4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)), for the registrant and have:
>
>    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our

supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

31. In the 2015 10-K, Misonix also made representations as to the effectiveness of its internal controls, stating as follows:

**Evaluation of Disclosure Controls and Procedures**

We maintain disclosure controls and procedures (as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended ("Exchange Act")) that are designed to assure that information required to be disclosed in our Exchange Act

> reports is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC, and that such information is accumulated and communicated to management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosures.
>
> As required by Exchange Act Rule 13a-15(b), as of the end of the period covered by this Annual Report, under the supervision and with the participation of our principal executive officer and principal financial officer, we evaluated the effectiveness of our disclosure controls and procedures. Based on this evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures were effective as of that date.
>
> **Management's Report on Internal Control over Financial Reporting**
>
> Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Exchange Act Rule 13a-15(f). Our internal control system was designed to provide reasonable assurance to our management and Board of Directors of adequate preparation and fair presentation of the published financial statements.
>
> All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to the adequacy of financial statement preparation and presentation. Our management assessed the effectiveness of the Company's internal control over financial reporting as of June 30, 2015. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control-Integrated Framework (2013 framework). Based on our assessment, we believe that as of June 30, 2015, the Company's internal control over financial reporting is operating as designed and is effective based on those criteria.

32. On November 5, 2015, the Individual Defendants caused Misonix to file with the SEC a Quarterly Report on Form 10-Q announcing the Company's financial and operating results for the first quarter ended September 30, 2015 (the "1Q16 10-Q"). The 1Q16 10-Q contained certifications pursuant to SOX signed by Defendants McManus and Zaremba attesting to the existence of effective internal controls, representing as follows:

> I, [McManus/Zaremba] certify that:
>
> 1. I have reviewed this quarterly report on Form 10-Q of MISONIX, INC.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to

the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

33. On December 30, 2015, the Individual Defendants caused Misonix to file with the SEC the 2016 Proxy, which solicited shareholder votes for, among other things, an advisory vote on the compensation of the Company's named executive officers, including, but not limited to, Defendant McManus. With regard to compensation, the 2016 Proxy stated, among other things:

**Compensation Discussion and Analysis**

Overview of Compensation Program and Philosophy

Our compensation program is intended to:

- Attract, motivate, retain and reward employees of outstanding ability;
- Link changes in employee compensation to individual and corporate performance;
- Align employees' interests with those of the Company's shareholders.

The ultimate objective of our compensation program is to increase shareholder value. We seek to achieve these objectives with a total compensation approach which takes into account a competitive base salary, bonus pay based on the annual performance of the Company and individual goals and stock option awards.

**Base Salaries**

Base salaries paid to executives are intended to attract and retain highly talented individuals. In setting base salaries, individual experience, individual performance, the Company's performance and job responsibilities during the year are considered. Executive salaries are reconciled by Human Resources and evaluated against local companies of similar size and nature.

***

**Employment Agreement**

On May 22, 2015, the Employment Agreement, dated July 1, 2014, by and between Michael A. McManus, Jr. and the Company was mutually terminated and replaced by a new Employment Agreement whereby Mr. McManus will continue to serve as the Company's President and Chief Executive Officer (the "McManus Agreement"). The McManus Agreement, effective as of May 22, 2015, has an initial term expiring June 30, 2017 and renews for successive one-year periods thereafter unless terminated by either party not less than ninety (90) days prior to the end of the then-current term. The McManus Agreement provides for an annual base salary of (i) $299,000 through June 30, 2015 and (ii) $325,000 commencing July 1, 2015, and an annual bonus based on Mr. McManus' achievement of annual goals and objectives as determined by the Compensation Committee of the Company's Board of Directors. Mr. McManus also received a one-time grant of options to purchase 100,000 shares of Common Stock at an exercise price of $11.88 per share (the "McManus Options"). The McManus Options vest in their entirety on June 30, 2017.

Mr. McManus is entitled under the McManus Agreement to participate in any plans and programs made available to the executive employees of the Company generally.

The Company can terminate the McManus Agreement for cause (as defined in the McManus Agreement). Mr. McManus can terminate the McManus Agreement for good reason (as defined in the McManus Agreement). If Mr. McManus terminates the McManus Agreement for good reason, the Company must (i) pay him an amount equal to two times his total compensation (annual base salary plus bonus) at the highest rate paid him at any time during the aggregate time he has been employed by the Company, payable in a lump sum within sixty days of termination of employment, and (ii) pay premiums for medical, dental, vision, hospitalization and long term care coverage under Company plans for a period of twenty-four (24) months.

34. The representations made in the 2016 Proxy were misleading in that they represented to investors that Misonix's compensation structure was intended to: (i) attract, motivate, retain and reward employees of outstanding ability; (ii) link changes to employee compensation to individual and corporate performance; (iii) align employee and shareholder interests; and (iv) increase shareholder value. In the 2016 Proxy, Misonix purported to employ a competitive, total compensation approach in determining executive compensation. Further, the statements in the 2016 Proxy indicate that the Company would terminate McManus, or any other

employee, for cause when appropriate. However, after becoming aware of improper activity by McManus, as discussed below, the Board did not terminate McManus for cause, but, rather, despite the significant harm he caused to the Company and its shareholders, determined to indemnify McManus, and continue to pay his salary and other benefits through June 30, 2017, and the Compensation Committee approved a $100,000 bonus.

35. As a result of the misleading statements in the 2016 Proxy, as well as the material omission of the lack of an effective internal control structure and compliance mechanisms, Misonix shareholders voted to approve the advisory resolution regarding McManus' compensation and the compensation for other named executives.

36. On February 9, 2016, the Individual Defendants caused Misonix to file with the SEC a Quarterly Report on Form 10-Q announcing the Company's financial and operating results for the second quarter ended December 31, 2015 (the "2Q16 10-Q"). The 2Q16 10-Q contained certifications pursuant to SOX signed by Defendants McManus and Zaremba substantially similar to those contained in the 1Q16 10-Q attesting to the existence of effective internal controls and corporate governance procedures.

37. On May 5, 2016, the Individual Defendants caused Misonix to file with the SEC a Quarterly Report on Form 10-Q announcing the Company's financial and operating results for the third quarter ended March 31, 2016 (the "3Q16 10-Q"). The 3Q16 10-Q contained certifications pursuant to SOX signed by Defendants McManus and Zaremba substantially similar to those contained in the 1Q16 10-Q attesting to the existence of effective internal controls and corporate governance procedures.

38. On August 26, 2016, Misonix filed with the SEC a Current Report on Form 8-K announcing that the Company had reached an agreement with McManus providing for his

"retirement" as President and CEO, effective September 2, 2016. The 8-K stated, in pertinent part, as follows:

> Pursuant to the Agreement, which supersedes the provisions of Mr. McManus' employment agreement dated May 22, 2015 (the "Employment Agreement") and letter agreements dated May 22, 2015, July 1, 2012 and July 1, 2012, respectively, the Company has agreed to (i) pay Mr. McManus' salary through June 30, 2017 at the current level; (ii) continue to pay premiums for Mr. McManus' and his dependents' coverage under the Company's medical, dental, vision, hospitalization, long term care and life insurance coverage through June 30, 2017 at the current levels upon timely election by Mr. McManus under the law informally known as COBRA; and (iii) extend the exercisability of previously granted and currently vested options to purchase shares of the Company's common stock, par value $.01 per share, through June 30, 2017.
>
> Mr. McManus shall have continued use of the vehicle provided him pursuant to the Employment Agreement through December 31, 2016.
>
> The Agreement provides for customary releases by both the Company and Mr. McManus as well as customary provisions concerning confidentiality, non-disparagement and cooperation.
>
> The Agreement provides that through June 30, 2017, upon request of the Company's (i) Board of Directors or (ii) President and Chief Executive Officer, Mr. McManus will consult with the Company for up to ten (10) hours per month without compensation therefor except for reimbursement of reasonable travel expenses.
>
> Mr. McManus shall continue to be entitled to indemnification to the extent permitted to him by the Company's By-Laws and Certificate of Incorporation. The Company has also agreed to maintain directors' and officers' liability insurance for Mr. McManus' benefit, if any, that shall be no less favorable to him than such insurance made available to or for the benefit of former directors or officers of the Company.

39. On September 14, 2016, Misonix filed with the SEC a Notification of Late Filing on Form 12b-25 revealing that the Company would not be able to timely file with the SEC its Annual Report on Form 10-K for its Fiscal Year ending June 30, 2016 due to "deficiencies [that] existed in the Company's internal control over financial reporting as of June 30, 2016," stating in pertinent part:

> The Audit Committee of MISONIX, INC. (the "Company") has determined that deficiencies existed in the Company's internal control over financial reporting at June 30, 2016. The Audit Committee is still considering whether or not the deficiencies constitute one or more material weaknesses in the Company's internal control over financial reporting at such date. Notwithstanding its determination, the Audit Committee has no current information to suggest that the Company's previously reported financial statements and results are incorrect in any material respect. The filing of the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2016 will be delayed pending completion of an investigation relating to these deficiencies being overseen by the Audit Committee.

40. On September 16, 2016, Misonix filed with the SEC a Current Report on Form 8-K disclosing that it had received a deficiency letter from The Nasdaq Stock Market LLC ("Nasdaq") indicating that the Company was not in compliance with Listing Rule 5250(c)(1) for continued listing as a result of its failure to timely file with the SEC its Annual Report on Form 10-K.

41. On September 19, 2016, a securities class action complaint was filed against Misonix, McManus, and Zaremba for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as well as Section 20(a) of the Exchange Act, in the United States District Court for the Eastern District of New York, captioned *Scalfani v. Misonix, Inc., et al.*, Case No. 16-cv-05218.

42. On September 28, 2016, Misonix filed with the SEC a Current Report on Form 8-K disclosing that on September 27, 2016, and September 28, 2016 the Company had contacted the SEC and the DOJ, respectively, to inform both agencies that the Company had knowledge of certain business practices by Cicel, the entity that Misonix contracted with to distribute its products in China, that indicate non-compliance with the FCPA. Misonix further disclosed that the Audit Committee had engaged outside counsel to conduct an internal review of these and other matters:

> On September 27, 2016 and September 28, 2016, respectively, Misonix, Inc. (the "Company") contacted the Securities and Exchange Commission ("SEC") and the U.S. Department of Justice ("DOJ") to voluntarily inform both agencies that the Company may have had knowledge of certain business practices of the independent Chinese entity that distributes its products in China, which practices raise questions under the Foreign Corrupt Practices Act ("FCPA").
>
> The Audit Committee of the Board of Directors of the Company engaged outside counsel to conduct an internal investigation to review these and other matters. The internal investigation is ongoing. The Company has no current information derived from the investigation to date or otherwise to suggest that its previously reported financial statements and results are incorrect in any material respect.
>
> The Company intends to cooperate fully with the DOJ and SEC as the investigation continues. At this stage, the Company is unable to predict what, if any, action the DOJ or the SEC may take or what, if any, penalties or remedial measures these agencies may seek. Any determination that the Company's operations or activities are not in compliance with existing laws or regulations could result in the imposition of fines, civil and criminal penalties, equitable remedies, including profit disgorgement, and injunctive relief.

43. On November 10, 2016, Misonix again filed with the SEC a Notification of Late Filing on Form 12b-25 representing that the Company would not be able to timely file its Quarterly Report on Form 10-Q for the period ended September 30, 2016 due to "an investigation being overseen by its Audit Committee related to deficiencies in the Company's internal control over financial reporting," stating in pertinent part:

> MISONIX, INC. (the "Company") previously reported that, as a result of an investigation being overseen by its Audit Committee related to deficiencies in the Company's internal control over financial reporting at June 30, 2016, the filing by the Company of its Annual Report on Form 10-K for the fiscal year ended June 30, 2016 would be delayed. This investigation, which includes an investigation of previously disclosed potential questions under the Foreign Corrupt Practices Act, is ongoing and, as a result, the filing of the Company's Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2016 also will be delayed pending completion of the investigation. As a result of the foregoing, the Company will not be in a position to file its Quarterly Report on Form 10-Q within the 5-day extension period provided in Rule 12b-25(b). The Company is working diligently to resolve these matters and intends to file its Quarterly Report on Form 10-Q and its Annual Report on Form 10-K as promptly as reasonably practicable. Management currently believes that the Company will be in a position to file the aforementioned reports not later than January 31, 2017.

44. On November 15, 2016, Misonix filed with the SEC a Current Report on Form 8-K disclosing that it had received a deficiency letter from Nasdaq indicating that the Company was not in compliance with Listing Rule 5250(c)(1) for continued listing as a result of its failure to timely file its Quarterly Report on Form 10-Q for the period ended September 30, 2016, together with its failure to timely file its Annual Report on Form 10-K for its Fiscal Year 2016.

45. On December 19, 2016, Misonix filed with the SEC a Current Report on Form 8-K announcing that Defendant Vizirgianakis had been appointed as Misonix's CEO and President. The 8-K also announced the resignation of Defendant Minetti from the Board.

46. On February 9, 2017, Misonix finally filed with the SEC its Annual Report on Form 10-K for the Fiscal Year ended June 30, 2016 (the "2016 10-K"). The 2016 10-K contained certifications pursuant to SOX signed by Defendant Vizirgianakis and Interim CFO Joseph P. Dwyer ("Dwyer") substantially similar to those contained in the 2015 10-K.

47. Misonix disclosed in the 2016 10-K that that it had concluded its "investigation into the business practices of the independent Chinese entity…as well as into various internal controls issues identified during the investigation (the 'Investigation')." Further, the Company disclosed that "management has determined, because of the findings from the Investigation, and the Company's inability to rely on certain personnel, processes and internal controls, that material weaknesses in internal control over financial reporting existed at June 30, 2016. In light of such material weaknesses, management has concluded that the Company's internal control over financial reporting was ineffective as of June 30, 2016."

48. The Company disclosed in the 2016 10-K that, with regard to material weaknesses:

> The Company did not have an effective control environment, risk assessment process, information and communication process and monitoring activities.

> These matters related to ineffective ethical governance, ineffective governance controls, and ineffectively implemented policies and procedures. The aggregation of issues identified within each of these areas resulted in the conclusion that a material weakness existed with respect to the "tone at the top" and effectiveness of governance within the Company. Specifically:
>
> - The Company failed to establish a tone at the top that demonstrated its commitment to integrity and ethical values.
> - The Company lacked effective controls and procedures to ensure that all members of management and Board members report to the full Board all possible illegal acts and violations of Company policy.
> - The Company lacked effective procedures and controls to ensure that all reimbursement requests are handled in a manner consistent with the Board's authorizations and the Company's policies and procedures.
> - The Company did not have effective information and communication and monitoring controls, including a robust whistleblower process, relating to the timely identification and communication of issues among financial reporting personnel, management, the Board, and the independent registered public accounting firm to enable appropriate analysis, financial reporting, and disclosure of such transactions
>
> The Company did not have effective information and communication and monitoring controls, including a robust whistleblower process, to ensure the timely identification and communication of issues to financial reporting personnel, management, and the Board, to enable appropriate financial reporting and disclosure of such transactions.
>
> In addition, the Company did not properly supervise the preparation and review the calculation of its income tax provision and deferred tax asset. While this control deficiency did not result in a material misstatement of the Company's financial statements, it could have resulted in misstatements of the aforementioned accounts and disclosures that would not be prevented or detected in a timely manner. Accordingly, our management concluded that this control deficiency also constitutes a material weakness.

49. Misonix also discussed in the 2016 10-K that "***in April 2016***, the Company's management had informed the Board of violations of Company policies and procedures and possible violations of laws and regulations, involving Michael A. McManus, the Company's former President and Chief Executive Officer, and other Company Personnel" (emphasis added),

which resulted in the Audit Committee initiating an investigation in "mid-May 2016," and the subsequent end of McManus' employment on September 2, 2016.

50. With regard to Defendant McManus' retirement, the Company noted in the 2016 10-K, in a section titled "Remediation of Material Weaknesses," that these changes, "including with respect to personnel changes, were and are essential steps to establishing and maintaining strong and effective internal control over financial reporting and addressing the tone at the top concerns that contributed to the material weaknesses identified." Thus, the Company acknowledged that McManus was culpable for the legal violations reported and was part and parcel with the "tone at the top" that failed to establish a culture of compliance and failed to establish an effective system of internal controls at the Company.

51. Additionally, the 2016 10-K disclosed that, rather than terminating Defendant McManus for cause as a result of his culpable conduct, the Board had determined to enrich McManus with golden parachutes and the continued payment of his benefits:

> **McManus Retirement Agreement**
>
> On August 26, 2016, the Company and Mr. McManus entered into a Retirement Agreement and General Release (the "Retirement Agreement"). Pursuant to the Retirement Agreement, on September 2, 2016 Mr. Mc Manus resigned as a Director and the Chairman of the Board of Directors of the Company and retired as President and Chief Executive Officer of the Company. Pursuant to the Retirement Agreement, which supersedes the McManus Agreement and letter agreements dated May 22, 2015, July 1, 2012 and July 1, 2012, respectively, the Company agreed to (i) pay Mr. McManus' salary through June 30, 2017 at the current level; (ii) continue to pay premiums for Mr. McManus' and his dependents' coverage under the Company's medical, dental, vision, hospitalization, long term care and life insurance coverage through June 30, 2017 at the current levels upon timely election by Mr. McManus under the law informally known as COBRA; and (iii) extend the exercisability of previously granted and currently vested options to purchase shares of the Company's Common Stock through June 30, 2017. In addition, Mr. McManus had continued use of the vehicle provided him pursuant to the McManus Agreement through December31, 2016.

> The Retirement Agreement provides for customary releases by both the Company and Mr. McManus as well as customary provisions concerning confidentiality, non-disparagement and cooperation.
>
> * * *
>
> **<u>Annual Bonus Plan Compensation</u>**
>
> The Compensation Committee of the Board approves annual performance-based compensation. The purpose of the annual bonus-based compensation is to motivate executive officers and key employees. Target bonuses, based upon recommendations from the Chief Executive Officer, are evaluated and approved by the Compensation Committee for all management employees other than the Chief Executive Officer. The bonus recommendations are derived from individual and Company performance but not based on a specific formula and are discretionary. The Chief Executive Officer's bonus compensation is derived from the recommendation of the Compensation Committee based upon the Chief Executive Officer's performance and Company performance but is not based on a specific formula and is discretionary.
>
> During the fiscal year ended June 30, 2016, bonuses based on performance in the fiscal 2015 year were paid to executive officers as follows: $100,000 to Mr. McManus, [and] $25,000 to Mr. Zaremba . . . .

52. The Company further disclosed in the 2016 10-K that, as a result of the investigation and related activities, it incurred approximately $1.5 million in professional fees as of December 16, 2016. Further, as a result of the investigation, the Company terminated its agreement with Cicel (its Chinese distributor), "which was the Company's largest customer during the prior three fiscal years."

53. On February 10, 2017, Misonix yet again filed with the SEC a Notification of Late Filing on Form 12b-25. The notification disclosed that the Company would not be able to timely file with the SEC its Quarterly Report on Form 10-Q for the period ended December 31, 2016, due to "backlog associated with completing and filing the 10-K and the preparation of the Q1 10-Q," stating in pertinent part:

> Misonix, Inc. (the "Company") previously reported that, as a result of a voluntary internal investigation overseen by its Audit Committee related to material weaknesses in the Company's internal control over financial reporting at June 30,

> 2016, the filing by the Company of its Annual Report on Form 10-K for the fiscal year ended June 30, 2016 (the "10-K") and the filing of the Company's Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2016 (the "Q1 10-Q") were being delayed pending completion of the investigation. The internal investigation has now been completed and the Audit Committee has no information to suggest that any of the Company's previously reported financial statements and results are incorrect in any material respect. Although the Company filed the 10-K on February 9, 2017, it is still in the process of preparing the Q1 10-Q and the Company's Quarterly Report on Form 10-Q for the fiscal quarter ended December 31, 2016 (the "Q2 10-Q"). As a result of the backlog associated with completing and filing the 10-K and the preparation of the Q1 10-Q, the Company will not be in a position to file the Q2 10-Q within the 5-day extension period provided in Rule 12b-25(b). The Company is working diligently to resolve these matters and intends to file both the Q1 10-Q and the Q2 10-Q as promptly as reasonably practicable. Management currently believes that the Company will be in a position to file the aforementioned reports not later than March 13, 2017.

54. On February 13, 2017, Misonix filed with the SEC a Current Report on Form 8-K disclosing that it had received a deficiency letter from Nasdaq indicating that the Company was not in compliance with Listing Rule 5250(c)(1) for continued listing as a result of its failure to timely file its Quarterly Report on Form 10-Q for the period ended December 31, 2016, together with its failure to timely file with the SEC its Quarterly Report on Form 10-Q for the period ended September 30, 2016.

55. On March 13, 2017, Misonix filed with the SEC its Quarterly Report on Form 10-Q for the period ended September 30, 2016 (the "1Q17 10-Q"). The 1Q17 10-Q contained certifications pursuant to SOX signed by Defendant Vizirgianakis and CFO Dwyer substantially similar to those contained in the 1Q16 10-Q.

56. The Company again disclosed in the 1Q17 10-Q "that material weaknesses in internal control over financial reporting existed at September 30, 2016. In light of such material weaknesses, management has concluded that the Company's internal control over financial reporting was ineffective as of September 30, 2016." The Company further revealed that its "investigative costs to date are approximately $1.9 million, of which approximately $0.6 million

was charged to general and administrative expenses during the quarter ended September 30, 2016."

57. Also on March 13, 2017, Misonix filed with the SEC its Quarterly Report on Form 10-Q for the period ended December 31, 2016 (the "2Q17 10-Q"). The 2Q17 10-Q contained certifications pursuant to SOX signed by Defendant Vizirgianakis and CFO Dwyer substantially similar to those contained in the 1Q16 10-Q.

58. The Company again admitted in the 2Q17 10-Q "that material weaknesses in internal control over financial reporting existed at December 31, 2016. In light of such material weaknesses, management has concluded that the Company's internal control over financial reporting was ineffective as of December 31, 2016."

59. The 2Q17 10-Q further revealed that Misonix's "investigative costs to date are approximately $1.9 million, of which approximately $1.4 million was charged to general and administrative expenses during the six months ended December 31, 2016."

60. On March 23, 2017, a lawsuit was filed against Misonix, Defendants Vizirgianakis, Zaremba, Miner, McBrayer, and Patton, and other Misonix executives by Cicel in the Eastern District of New York, titled *Cicel (Beijing) Science & Technology Co. Ltd. v. Misonix, Inc. et al.*, Case No. 2:2017-cv-01642. In the lawsuit, Cicel alleges that its relationship with Misonix began in 2010, and that Misonix wrongfully terminated the companies' Sole Distribution Agreement by letter on September 27, 2016. Cicel represents in its Amended Complaint, filed on April 5, 2017, that, "[t]o date, Cicel has not been contacted by the SEC or DOJ concerning any purported FCPA violations" and that Misonix's termination letter "makes no reference to any wrongdoing whatsoever by Cicel and specifies no reason for the Agreement's termination."

61. On May 2, 2017, Misonix filed with the SEC its Quarterly Report on Form 10-Q for its third quarter ended March 31, 2017 (the "3Q17 10-Q"). The 3Q17 10-Q contained certifications pursuant to SOX signed by Defendant Vizirgianakis and CFO Dwyer substantially similar to those contained in the 1Q16 10-Q.

62. The Company yet again admits in the 3Q17 10-Q "that material weaknesses existed at March 31, 2017" and that "[i]n light of such material weaknesses, management has concluded that the Company's internal control over financial reporting was ineffective as of March 31, 2017."

63. The Company further disclosed in the 3Q17 10-Q that Misonix's "investigative costs to date are approximately $2.1 million, of which approximately $2.0 million was charged to general and administrative expenses during the nine months ended March 31, 2017."

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

64. Plaintiff brings this action derivatively in the right and for the benefit of Misonix to redress injuries suffered, and to be suffered, by Misonix as a direct result of the Individual Defendants' breaches of fiduciary duty.

65. Misonix is named as a nominal defendant solely in a derivative capacity.

66. The wrongful acts complained of herein subject, and will continue to subject, Misonix to continuing harm because the adverse consequences of those wrongful actions are ongoing.

67. The wrongful acts complained of herein were unlawfully concealed from Misonix's shareholders.

68. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

69. Plaintiff did not make a pre-suit demand on the Board to pursue this action because such a demand would have been a futile and wasteful act.

70. At the time this action was commenced, the Board consisted of the following five (5) directors: Defendants Vizirgianakis, Gildea, Miner, McBrayer, and Patton. A majority of these individuals are not disinterested and independent with respect to the acts and omissions alleged herein. Indeed, Misonix's Board has already demonstrated that it cannot independently and disinterestedly consider a pre-suit demand to bring the claims set forth herein since, despite the wrongdoing of the Individual Defendants through their false and misleading statements, the Board has taken no action to address the harm this misconduct has caused the Company. Indeed, the Board allowed Defendant McManus to retire with a substantial golden parachute rather than terminating him for cause for his breaches of fiduciary duty.

**Defendant Vizirgianakis is Not Independent**

71. The principal occupation of Defendant Vizirgianakis is his employment with Misonix as its CEO and as a director. In September 2016, Vizirgianakis was named as Interim CEO of Misonix, and in December 2016 was named its full-time CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits. In addition, in the Company's April 28, 2017 Proxy Statement (the "2017 Proxy"), the Board has admitted that Defendant Vizirgianakis is not independent under the Nasdaq listing standards, which defines an independent director as person free of any relationship with Misonix that, in the opinion of the Board, would interfere with the exercise of such person's independent judgment in carrying out the responsibilities of a director, and to meet the then-current objective standards for "director independence" set forth in the listing standards. Making a demand on Defendant Vizirgianakis would be a futile, wasteful, and useless act.

**The Director Defendants Face a Substantial Likelihood of Liability for Their Misconduct**

72. The Director Defendants owed Misonix the highest duty of loyalty and breached that duty by recklessly permitting, and in some cases directly contributing to, the Company's issuance of false and misleading statements concerning Misonix's compliance with the laws, rules, and regulations, and the effectiveness of its internal controls over financial reporting. Accordingly, the Director Defendants face a substantial likelihood of liability.

73. Each of the Director Defendants, individually and collectively, face a substantial likelihood of liability as a result of their causing the Company to conceal the truth about its operations, rendering them unable to impartially investigate the charges and decide whether to pursue action against themselves on behalf of the Company.

74. The Director Defendants were and remain subject to the Company's Ethics Code, which states that "[t]ransparency is a basic expectation of all employees, directors and agents of Misonix. Nowhere is this more essential than in our financial statements.... Therefore, Misonix employees, directors or agents may not: Attempt to mask or obscure any financial results." The Individual Defendants violated the Ethics Code by concealing the truth, which, in turn caused the Company to distribute false and misleading financial information, harming the Company and its shareholders. Because the Director Defendants violated the Ethics Code, they face a substantial likelihood of liability for their breaches of fiduciary duties.

75. The Director Defendants knew since at least Aril 2016, five months before McManus was permitted to "retire," of material improprieties at Misonix involving McManus, including "violations of Company policies and procedures and possible violations of laws and regulations." Despite the Board's admission that replacing Defendant McManus as CEO was an "essential step[] to establishing and maintaining strong and effective internal control over

financial reporting and addressing the tone at the top concerns that contributed to the material weakness identified," the Board caused or allowed the Company to indemnify Defendant McManus and continue to pay his substantial salary and medical premiums and other benefits through June 30, 2017.

76. The Ethics Code requires that Misonix employees, directors and agents "[p]romptly report any concerns including potential violations of the Code or Misonix's policies and procedures to an appropriate person." However, Misonix has admitted that "[t]he Company lacked effective controls and procedures to ensure that all members of management and Board members report to the full Board all possible illegal acts and violations of Company policy." This admission indicates that at least some Board members knew of the illegal acts at Misonix for some time before the full Board was apprised of them in April 2016, yet failed to take timely and appropriate action, including by failing to even inform the full Board of the known wrongdoing.

**The Audit Committee Members Face a Substantial Likelihood of Liability for Their Misconduct**

77. During the relevant period, Defendants Patton, Gildea, McBrayer, and Minetti served as members of the Audit Committee of the Board. Pursuant to the Charter of the Audit Committee, all members of the Audit Committee were and are responsible for, among other things, overseeing the Company's internal audit function, monitoring compliance with the Ethics Code, and reviewing with the General Counsel all legal and regulatory matters, including legal cases against, or regulatory investigations of, the Company. In addition, the Audit Committee Defendants were responsible for:

- recommending to the Board that the audited financial statements be included in the Company's Form 10-K and produce the audit committee report required to be included in the Company's proxy statement;

- reviewing and discussing with the Company's independent auditors and management the Company's quarterly financial statements to be included in the Company's quarterly report on Form 10-Q before the Form 10-Q is filed;

- reviewing and discussing with management: the Company's earnings press releases, including the type of information to be included and its presentation and the use of any pro forma, adjusted or other non-GAAP financial information, before their release to the public; and any financial information and earnings guidance provided to analysts and ratings agencies, including the type of information to be disclosed and type of presentation to be made.

78. Defendants Patton, Gildea, and McBrayer breached their fiduciary duties of good faith, loyalty and due care because the Audit Committee, among other things, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures, and caused the above-discussed internal control failures. Therefore, Defendants Patton, Gildea, and McBrayer each face substantial liability for their breach of fiduciary duties, and any demand upon them would be a futile, wasteful and useless act.

**The Compensation Committee Members Face a Substantial Likelihood of Liability for Their Misconduct**

79. During the relevant period, Defendants Miner, McBrayer, Patton and Minetti served as members of the Compensation Committee of the Board. Pursuant to the Charter of the Compensation Committee all members of the Compensation Committee were and are responsible for, among other things, reviewing and determining executive compensation. In addition, the Audit Committee Defendants were responsible for:

- Reviewing and approving annually the corporate goals and objectives applicable to the compensation of the chief executive officer;

- Reviewing and approving the compensation of all other executive officers; and

- Reviewing and approving, with respect to the CEO, and reviewing, making recommendations to the Board regarding, or approving, with respect to the other executive officers, any employment agreements and any severance arrangements or plans, including any benefits to be provided in connection with a change in

control, which includes the ability to adopt, amend and terminate such agreements, arrangements or plans.

80. Defendants Miner, McBrayer, Patton, and Minetti breached their fiduciary duties of due care, loyalty, and good faith, because the Compensation Committee, among other things, after the entire Board indisputably was informed of wrongdoing including with respect to McManus, approved a $100,000 bonus to defendant McManus "based on performance in the fiscal 2015 year," and additionally approved the McManus Retirement Agreement to the detriment of Misonix and its stockholders.

81. Thus, for the reasons set forth above, all of the Director Defendants, and if not all of them, certainly the majority cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile and this stockholder derivative action should be allowed to proceed.

## COUNT I

**Against Defendants McManus, Vizirgianakis, Gildea, Miner, McBrayer, Patton, and Minetti for Violations of Section 14(a) of the Exchange Act**

82. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

83. The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of Defendants McManus, Vizirgianakis, Gildea, Miner, McBrayer, Patton, and Minetti. The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

84. Defendants McManus, Vizirgianakis, Gildea, Miner, McBrayer, Patton, and Minetti negligently issued, caused to be issued, and participated in the issuance of materially

misleading written statements to stockholders which were contained in the 2016 Proxy. The 2016 Proxy contained a proposal to Misonix's stockholders urging stockholders to approve executive compensation. The Proxy, however, misrepresented and failed to disclose that the Company's internal controls were inadequate, Misonix would not actually terminate employees for cause where appropriate, and the Company's executive compensation structure was not actually intended to: (i) motivate and reward employees of outstanding ability; (ii) link salaries to individual and corporate performance; (iii) align employee interests with those of the Company's stockholders; or (iv) increase stockholder value. By reason of the conduct alleged herein, Defendants McManus, Vizirgianakis, Gildea, Miner, McBrayer, Patton, and Minetti violated Section 14(a) of the Exchange Act. As a direct and proximate result of the Director Defendants' wrongful conduct, Misonix misled and/or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding Misonix's recommendation to approve certain executive compensation.

85. The misleading information contained in the Proxy was material to Misonix's stockholders in determining whether or not to approve certain executive compensation. The proxy solicitation process in connection with the Proxy was an essential link in the approval of the executive compensation plan.

86. Plaintiff, on behalf of Misonix, seeks relief for damages inflicted upon the Company based upon the misleading Proxy in connection with the improper approval of executive compensation.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duties for Disseminating False and Misleading Information

87. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

88. As alleged in detail herein, each of the Individual Defendants violated and breached their fiduciary duties of loyalty, due care and good faith by causing or allowing the Company to disseminate to Misonix shareholders materially misleading and inaccurate information through, among other things, SEC filings, press releases, and other public statements and disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

89. As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages. Thus, as a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT III

### Against the Individual Defendants for Breach of Fiduciary Duties for Failing to Maintain Internal Controls

90. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

91. As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company implemented and maintained an effective system of internal controls.

92. The Individual Defendants, most notably those serving on the Board's Audit Committee, willfully ignored the known and pervasive problems with Misonix's internal controls

and practices and procedures and failed to make a good faith effort to correct these problems or prevent their recurrence.

93. As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages. Thus, as a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT IV

### Against the Individual Defendants for Indemnification

94. Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

95. The Individual Defendants violated their fiduciary duties of loyalty, good faith, and due care.

96. Misonix has suffered significant injury has a result of the Individual Defendants' breaches of fiduciary duty as alleged herein. Plaintiff, on behalf of the Company, seeks relief from the Individual Defendants on the theory of indemnity for all damages that occurred as a result of the Individual Defendants' violations of their fiduciary duties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief in their favor and on behalf of Misonix, and against Individual Defendants as follows:

A. Against the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B. Declaring that the Individual Defendants have breached their fiduciary duties owed to Misonix and its stockholders;

C. Requiring the Individual Defendants to remit to Misonix all of their salaries, fees, bonuses, stock awards, and other compensation for the periods when they breached their fiduciary duties;

D. Directing Misonix to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws, and to protect the Company and its stockholders from a repeat of the damaging events described herein;

E. Awarding to Plaintiff the costs and disbursements in connection with this action, including reasonable attorneys' fees, experts' and consultants' fees and expenses, and if applicable, pre-judgment and post-judgment interest; and

F. Awarding to Plaintiff such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 16, 2017

Joseph H. Weiss
David C. Katz
**WEISSLAW LLP**
1500 Broadway;16th Floor
New York, NY 10036
Telephone: (212) 682-3025
Facsimile: (212) 682-3025
jweiss@weisslawllp.com
dkatz@weisslawllp.com

*Plaintiff's Counsel*